GIBBS LAW GROUP LLP
Eric H. Gibbs (SBN 178658)
Michael L. Schrag (SBN 185832)
Aaron Blumenthal (SBN 310605)
505 14th Street, Suite 1110
Oakland, CA  94612
Telephone:  510-350-9700
Facsimile:  510-350-9701
ehg@classlawgroup.com
mls@classlawgroup.com
ab@classlawgroup.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Gene Conklin, on behalf of himself and all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>Wells Fargo & Company and Wells Fargo Bank, N.A., D/B/A Wells Fargo Dealer Services, and National General Insurance Company,<br><br>  Defendants. | Case No. 17-cv-04975<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## Introduction

1. Wells Fargo, the nation's second largest auto lender, told car buyers who financed their vehicles with the bank that they needed to maintain insurance on the vehicle at all times. If they did not have insurance, the finance contract authorized Wells Fargo to "force place" insurance on the car. Wells Fargo got to select the insurance policy and force the borrower to pay for it.

2. Wells Fargo was supposed to only force insurance on borrowers who were uninsured. But, an internal Wells Fargo report, leaked to the *New York Times*, revealed that in coordination with National General Insurance, Wells Fargo had illegally forced 800,000 people *who already had their own car insurance* to borrow money to pay premiums on expensive force-placed insurance policies. In many cases, Wells Fargo did not even tell borrowers that it was dramatically increasing their total debt to purchase insurance they did not need and were not required to have.

3. This allowed Wells Fargo and National General Insurance to collect tens of millions of dollars in illegally collected premium and interest payments. In addition, hundreds of thousands of people had their loans pushed into delinquency because they didn't pay the premiums on the redundant insurance. Some people didn't pay because Wells Fargo never told them about the charges. Some didn't pay because they couldn't—the premiums on the force placed policies were up to 10 times more expensive than regular car insurance.

4. And, for tens of thousands of people, Wells Fargo repossessed their cars due to non-payment for the redundant insurance.

5. In a statement, a Wells Fargo spokesperson said, "We take full responsibility for these errors." Victims of Wells Fargo's fraudulent conduct have heard this before; Plaintiff brings this lawsuit to seek complete recovery for himself and the proposed Class, and to hold Wells Fargo accountable for its unlawful conduct.

## Parties

6. Plaintiff Gene Conklin is a natural person and a citizen and resident of California.

7. Defendant Wells Fargo & Company is incorporated in Delaware and is headquartered in San Francisco, California.

8. Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States with its principal place of business in South Dakota. Wells Fargo Bank, N.A., doing business as Wells Fargo Dealer Services, provided auto lending services at issue in this suit. Wells Fargo Bank, N.A. is Wells Fargo & Company's primary subsidiary.

9. Wells Fargo & Company and Wells Fargo Bank, N.A. will be referred to collectively as "Wells Fargo."

10. Defendant National General Insurance Company is a national insurance agency incorporated in Missouri, with its primary place of business in Winston-Salem, North Carolina.

## Jurisdiction and Venue

11. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from at least one defendant, there are 100 or more Class members, and the aggregate amount in controversy is greater than $5 million.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants, a substantial portion of the alleged wrongdoing occurred in this District, and Defendants have sufficient contacts with this District.

13. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims arose in this District.

## Intradistrict Assignment

14. Assignment to the San Francisco Division of this Court is proper because a substantial part of the events and omissions which gave rise to the claims occurred at Wells Fargo & Company's corporate headquarters, located in San Francisco.

## Factual Allegations

15. Certain types of loans are backed by collateral. Mortgages are backed by the value of the borrower's home, or other real estate. Automobile loans are backed by the value of the car. If the borrower fails to pay, the bank can recoup its money by seizing the collateral. Homes can be foreclosed upon, and vehicles can be repossessed.

16. Some contracts for collateral-backed loans contain a provision permitting the bank to place an insurance policy on the collateral, at the borrower's expense, if the borrower lacks his or her own coverage. This "force placed insurance," foisted on the borrower, is designed to protect the bank's interest in the collateral, in case of damage or loss.[1] For a mortgage, the bank wants to insure the house against destruction by flooding, fire, hurricanes, and other natural disasters. For a car loan, the bank wants to insure the vehicle against the risk of theft, or destruction in an accident.

17. Between the late 1980s and mid-1990s, force placed insurance became common in the mortgage industry.[2] Wells Fargo, Bank of America, J.P Morgan Chase, and Citi—the banks with the most mortgages—all employed the practice. Driven by the big banks, force placed insurance became a "highly lucrative multi-billion dollar industry."[3]

18. While there may be a legitimate need in some circumstances for a financial institution to issue forced place insurance, it is also a financial sector rife with potential abuse, conflicts of interest, self-dealing and fraud. Allegations surfaced after the 2008 financial crisis that the banks were "receiving kickbacks or unlawful commissions from force-placed insurance companies."[4] If the bank received a percentage of the commission for issuing a force placed insurance policy, the bank had an "incentive to select the most expensive policy."[5] More expensive policies yielded larger commissions.[6] Between 2004 and 2011, the premiums for force

---

[1] Because it protects the bank's collateral, force placed insurance is also referred to as "collateral protection insurance."

[2] Deborah R. Hensler et al., *Class Action Dilemmas: Pursuing Public Goals for Private Gain*, Rand Institute for Civil Justice (2000), at *191, *available at* https://www.rand.org/content/dam/rand/pubs/monograph_reports/MR969/MR969.ch7.pdf.

[3] Dana Cronkite, *Force-Placed Insurance: The Lending Industry's 'Dirty Little Secret,'* 91 Chi.-Kent L. Rev. 687, 700 (2016), *available at* http://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?article=4124&context=cklawreview.

[4] *Id*. at 689.

[5] *Id*. at 703.

[6] *Id*.

placed homeowner's insurance quadrupled.[7] The cost of force placed insurance to consumers became "up to 10 times more than traditional homeowners insurance."[8]

19. Due to kickbacks and other incentives, the mortgage-industry "banks profit[ed] greatly from the force-placed insurance industry."[9] Between 2006 and 2013, "J.P. Morgan Chase, for example, reportedly earn[ed] about $600 million" from force placing insurance.[10]

20. Starting in 2012, borrowers began suing the mortgage lenders for their practices surrounding force placed insurance. The plaintiffs generally alleged that by receiving a kickback for force placing expensive insurance policies on borrowers, the banks breached their contracts with borrowers, breached the covenant of good faith and fair dealing, breached their fiduciary duty, and were unjustly enriched.[11] The plaintiffs who sued Wells Fargo also brought a claim under the Racketeer Influenced and Corrupt Organizations (RICO) Act, alleging that Wells Fargo conspired with QBE Insurance[12] to "extract artificially inflated premiums from [Wells Fargo] customers," in exchange for kickbacks.[13] QBE is one of the "main force-placed insurance companies."[14]

21. The four largest mortgage lenders (J.P. Morgan, Wells Fargo, Bank of America, and Citi) collectively agreed to pay $979 million to settle these lawsuits.[15] The banks also agreed

---

[7] *Id.*

[8] Lender's Risk, *Regulatory Landscape for 2016: Lender-Placed Insurance and What You Need to Know* (Feb. 8, 2016), http://lendersrisk.com/index.php/regulatory-landscape-for-2016-lender-placed-insurance-and-what-you-need-to-know/.

[9] Cronkite, *supra* note 3, at 691.

[10] Cronkite, *supra* note 3, at 691.

[11] *See, e.g.*, Complaint, *Saccoccio v. JP Morgan Chase Bank, N.A.*, No. 13-cv-21107, 2013 WL 5636445 (S.D. Fla. Oct. 2, 2013).

[12] QBE is also the provider for some of Wells Fargo's force placed auto insurance policies. In 2015, QBE (North America) was bought out by National General Insurance's parent company.

[13] Second Amended Complaint, *Fladell v. Wells Fargo Bank, N.A.,* No. 0:13-cv-60721, Dkt. 155-1 at 55 (S.D. Fla. Mar. 3, 2014).

[14] Cronkite, *supra* note 3, at 693.

[15] *Id.* at 699 n.108 (Bank of America settled for $228 million and JP Morgan for $300 million); Sakthi Prasad, *Citi to pay $110 million in a lawsuit over force-placed insurance*, Reuters (Feb. 5, 2014), http://www.reuters.com/article/us-citi-insurance-settlement-idUSBREA1508Z20140206; *Fladell v. Wells Fargo Bank, N.A.,* Dkt. 182 at 1 (S.D. Fla. Aug. 4, 2014) ($281 million in monetary relief).

to injunctive relief prohibiting the banks from receiving commissions for force placing insurance.[16] These prohibitions continue to apply to all four banks until around 2020.[17]

22. While force placed insurance has been common in "the mortgage arena," it has been "not as common" for car loans.[18] J.P. Morgan, Bank of America, and Citi disavowed using such policies for auto loans.[19] Wells Fargo, however, began force placing insurance as part of its car financing program "as early as 2006."[20]

23. In 2015-2016, Wells Fargo hired a consulting firm, Oliver Wyman, to assess the company's practices surrounding its force placing of insurance on auto loans. This assessment came on the heels of a scandal over Wells Fargo employees opening millions of accounts in customers' names without their knowledge.[21] The account opening fraud was caused in part, according to a Vanity Fair article, by Wells Fargo higher-ups "cultivating a cut-throat corporate culture that drove employees to do whatever was necessary to meet unrealistic sales quotas."[22]

24. The Oliver Wyman assessment looked at insurance policies that were force placed by Wells Fargo between January 2012 to July 2016.

25. After conducting its review, Oliver Wyman issued a 60-page internal report "prepared for the bank's executives."[23] This report, leaked to the New York Times, found that Wells Fargo had force placed insurance on more than 800,000 borrowers who already had their

---

[16] *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 689-90 (S.D. Fla. 2014); *Hall v. Bank of Am., N.A.,* No. 1:12-cv-22700, Dkt. 403-1 at 20 (S.D. Fla. Sept. 12, 2014); *Casey v. Citibank, N.A.,* No. 5:12-cv-00820, Dkt. 197-2 at 7 (N.D.N.Y. July 18, 2014); *Fladell v. Wells Fargo Bank, N.A.,* No. 0:13-cv-60721, Dkt. 182 at 7 (S.D. Fla. Aug. 4, 2014).

[17] *Op cite*.

[18] Gretchen Morgenson, *Wells Fargo Forced Unwanted Auto Insurance on Borrowers*, N.Y. Times (July 27, 2017), https://www.nytimes.com/2017/07/27/business/wells-fargo-unwanted-auto-insurance.html.

[19] *Id.*

[20] *Id.*

[21] Bess Levin, *Oops: Wells Fargo Admits Charging 800,000 People for Car Insurance They Didn't Need*, Vanity Fair (July 28, 2017), https://www.vanityfair.com/news/2017/07/wells-fargo-insurance-scandal.

[22] *Id.*

[23] *Id.*

own car insurance coverage.[24] Per the terms of its own loan contracts, Wells Fargo was not legally entitled to force place insurance on individuals who already had insurance.

26. According to the same internal report, the expense of the duplicative insurance "pushed roughly 274,000 Wells Fargo customers into delinquency" on their loans and "resulted in almost 25,000 wrongful vehicle repossessions."[25]

27. For force placing insurance on auto loans, Wells Fargo received kickbacks.[26] From 2006 to 2013, Wells Fargo received a commission for force placing auto insurance through National General Insurance.[27]

28. National General also received substantial profits for its role in force placing insurance. In theory, National General was supposed to check a database, before one of its agent's force placed a policy, to confirm that the borrower did not already have their own insurance.

29. Wells Fargo also profited by charging interest on the premiums owed for force placed insurance.[28] When charging a customer for premiums, Wells Fargo would assess a full year's worth of premiums against the customer's account. Wells Fargo then charged interest each month, calculated against the yearly premium amount.[29]

30. Force placed insurance also kept many borrowers in debt for a longer period, and the longer a borrower stayed in debt, the more Wells Fargo earned in interest. Wells Fargo strategically applied customers' monthly payments to the interest and premiums on the force placed insurance before applying any payments to principal or past due amounts, respectively.[30] Customers who fell behind on their force placed insurance payments paid down principal at a slower rate, lengthening the life of the loan and causing them to pay Wells Fargo more interest.

---

[24] Id.
[25] Id.
[26] Id.
[27] Id.
[28] Wells Fargo Dealer Services, *Understanding Your Auto Loan*, accessed Aug. 21, 2017, https://goo.gl/8S9mjr.
[29] Id.
[30] Id.

31. Customers who used auto-pay often found themselves in delinquency without even knowing about the force placed insurance. The Oliver Wyman report found that Wells Fargo often failed "to notify customers of the insurance before it was imposed."[31] Many auto-pay customers paid a fixed amount each month, which did not adjust automatically based on the amount due.

*Figure 1: Wells Fargo's Automatic Loan Payment Authorization Form*[32]

| Part 3: Wells Fargo Dealer Services account information | |
|---|---|
| Contract/loan account number (The account that will receive the funds) | Amount to be transferred each month (Must be equal to, or greater than, the scheduled amount and not to exceed three times the amount.) |

These customers had no reason to know that they were paying anything less than the full amount due, and yet were placed in delinquency because the illegal forced place insurance charges caused their regular payment to be insufficient to meet loan requirements regarding payment of principal.

32. Customers who weren't notified also had no chance to prove to Wells Fargo that they already had insurance, before being charged. Customers often did not realize they were being charged until they were sent to collections for failing to pay for the force placed insurance.[33]

33. When customers learned of the force placed insurance, providing proof of insurance often did no good. One consumer, who complained to the Consumer Financial Protection Bureau (CFPB) about Wells Fargo, said, "We have provided proof of insurance numerous times, with the most recent last week … we have now found that they are still placing force placed insurance [even though] we have always covered the vehicle with full coverage."[34] Another consumer told the CFPB that Wells Fargo was still charging her for force placed insurance, even after she faxed proof of insurance, had her insurer's customer service department

---

[31] Morgenson, *supra* note 18.
[32] Wells Fargo Dealer Services, accessed Aug. 22, 2017, https://www.wellsfargodealerservices.com/ConsumerSite/RxCMS/PDF/OF-60.pdf.
[33] *See, e.g.,* Consumer Financial Protection Bureau Complaint IDs 2254942, 1677501.
[34] CFPB Complaint ID 2254942.

fax proof of insurance, had her insurance agent fax proof of insurance *three* times, and had her insurance agent call Wells Fargo and give her insurance information over the phone *twice*.[35]

34. Some customers, in utter frustration, returned their cars to the dealership rather than deal with Wells Fargo. One consumer said: "I previously had a 2008 Pontiac Grand Am and Wells Fargo on more than one occasion added car insurance to my loan when I already had full coverage on my own. I eventually tired of the hassle and voluntarily gave the car back because I was constantly calling and faxing them my insurance documents so they could remove the insurance they added." Another consumer, who had Wells Fargo financing on her Saturn, said: "We had insurance from day one but they claimed they never received paperwork. I faxed several times, never got it straightened out. We returned that Saturn back to Kia and purchased a Sportage, just to get away from Wells Fargo!"

35. Even those who successfully convinced Wells Fargo that they already had insurance did not get full reimbursement, Wells Fargo would refund a portion of the premiums, but would not refund the interest charged on the premiums.

36. Plaintiff Gene Conklin bought a Nissan Altima financed through Wachovia in 2008. Wachovia was subsequently bought out by Wells Fargo. In 2011, Wells Fargo force placed insurance on Mr. Conklin's Nissan, without notifying him. At the time, Mr. Conklin had already provided proof of insurance to Wells Fargo. Mr. Conklin had applied to Wells Fargo for approval to get his Nissan shipped to St. Thomas, Virgin Islands. Because the vehicle was collateral on a loan, Wells Fargo needed to sign off on the shipment. Wells Fargo told Mr. Conklin that it would not approve the shipment unless he provided proof of insurance, which he did. Wells Fargo gave its approval.

37. After the vehicle shipped, Wells Fargo force placed insurance on the car. Wells Fargo never notified Mr. Conklin of the force placed insurance. Mr. Conklin only found out about it when he called to make a payment, and the customer service representative could not find his loan account number. Eventually, they redirected him to the repo department. Only at that point did Wells Fargo tell him he was five months in arrears on the premiums. Wells Fargo had already

---

[35] CFPB Complaint ID 1677501.

8
CLASS ACTION COMPLAINT

begun the process to repossess the vehicle. Wells Fargo gave Mr. Conklin 48 hours to pay $5,500, or they would repossess. Mr. Conklin was unable to pay this sum in that timeframe. Wells Fargo repossessed the Nissan in March 2012.

38. Ultimately, Wells Fargo said that Mr. Conklin owed $8,169 on his vehicle loan. Mr. Conklin was forced to declare bankruptcy to wipe out this debt. Mr. Conklin continues to suffer a negative impact to his credit rating due to Wells Fargo's conduct.

## Class Allegations

39. Pursuant to the Federal Rule of Civil P. 23(b)(3), Plaintiff asserts claims on behalf of the following "Class": All persons in the United States who financed an automobile through Wells Fargo and were assessed a charge for redundant force placed insurance. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

40. This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(b)(3). Plaintiff seeks to represent an ascertainable Class, as determining inclusion in the class can be done through Wells Fargo's own records.

41. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

42. Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Plaintiff believes, and on that basis allege, that the proposed Class is so numerous that joinder of all members would be impracticable. An internal Wells Fargo report, leaked to the New York Times, indicates that the number of potential Class members may exceed 800,000.

43. Questions of law and fact common to the putative Class exist that predominate over questions affecting only individual members, including *inter alia*:

     a.    Whether Wells Fargo knew class members had insurance and/or failed to adequately confirm the non-existence of customers' own insurance coverage prior to force placing a policy;

     b.    Whether Wells Fargo knew or should have known that National General failed to adequately confirm the non-existence of customers' own insurance coverage prior to force placing a policy;

     c.    Whether Wells Fargo's practice of force placing insurance without providing notice and an opportunity to provide proof of insurance constitutes an unfair business practice under California's Unfair Competition Law;

     d.    Whether Wells Fargo systematically refused to honor proof of insurance, when it was provided;

     e.    Whether Wells Fargo failed to refund interest paid on premiums for a coverage period after a customer provided proof of insurance;

     f.    Whether Wells Fargo converted the Class's property, and if so, whether Wells Fargo's conduct is oppressive;

     g.    Whether Wells Fargo's conduct violates RICO;

     h.    Whether National General's conduct violates RICO;

     i.    Whether, as a result of Wells Fargo's and National General's conduct, the Class has suffered damages, and if so, the appropriate amount; and

     j.    Whether Wells Fargo's and National General's wrongful conduct entitles Plaintiff and the Class to equitable and declaratory relief, and if so, the nature of such relief.

44.    Plaintiff is a member of the putative Class. The claims asserted by the Plaintiff in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Defendants and the relief sought is common.

45.    Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Class, as his interests are coincident with, not antagonistic to, the other members of the Class.

46.    Plaintiff have retained counsel competent and experienced in both consumer

protection and class action litigation. Plaintiff's counsel specifically has experience litigating some of the largest and most complex consumer class actions, including numerous consumer class actions in the Northern District of California.

47. Certification of the Class is appropriate pursuant to Fed. R. C. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be highly unlikely that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

48. A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

49. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

**Tolling**

50. Plaintiff and the class could not have discovered through reasonable diligence that Wells Fargo and National General were engaged in a nationwide practice of charging Wells Fargo customers for redundant force placed insurance.

51. Plaintiff and the class had no ability to discover existence of this scheme, as the evidence was in the exclusive control of Wells Fargo and National General, until a Wells Fargo internal report leaked to the New York Times, which published a story about the report on July 27, 2017.

**First Cause of Action**
*Unfair Conduct in Violation of California's Unfair Competition Law*
(On Behalf of Plaintiff Conklin and the Class, against all Defendants)

52. Plaintiff incorporates by reference all allegations, as if fully set forth herein.

53. Defendants violated California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq., by engaging in unfair and fraudulent business acts and practices.

54. Wells Fargo's conduct constitutes an "unfair" practice, within the meaning of the UCL, because their conduct was unscrupulous and caused substantial harm. This conduct includes: force placing insurance without prior notice to its customers that such insurance would be placed; force placing insurance without having sufficient internal controls to ensure that Wells Fargo had a reasonable basis to believe that the borrower lacked his or her own insurance policy; refusing to honor customers' proof of insurance, when it was provided; imposing an arbitrary requirement that Wells Fargo must be named as a loss payee on a customer's insurance policy; placing the burden of collecting proof of insurance on the customer or his/her insurance agent, rather than on the Wells Fargo dealer or National General; refusing to fully refund interest and premiums paid for force placed insurance, even when proof of insurance was provided; purchasing all force placed insurance from exclusive providers, rather than shopping for policies on the open market; receiving kickbacks in exchange for choosing a particular force placed insurance provider, rather than negotiating with the provider at arm's length; and passing the cost of those kickbacks on to the customer. These practices caused substantial harm to Wells Fargo customers who had cars repossessed, accounts sent into delinquency, or paid premiums and interest for redundant insurance, without realizing it. These harms outweigh any possible utility of the conduct.

55. The conduct described in the previous paragraph is additionally "unfair" because it violates the policy and spirit of Regulation X, 12 C.F.R. § 1024.37. This conduct is comparable to a violation of: § 1024.37(c)(1), requiring that "[b]efore a servicer assesses on a borrower any premium charge or fee related to force-placed insurance, the servicer must: Deliver to a borrower or place in the mail a written notice … at least 45 days before a servicer assesses on a borrower such charge or fee"; § 1024.37(b), stating that a " servicer may not assess on a borrower a

premium charge or fee related to force-placed insurance unless the servicer has a reasonable basis to believe" the borrower lacks his or her own insurance policy; § 1024.37(h), requiring that "all charges related to force-placed insurance assessed to a borrower by or through the servicer must be bona fide and reasonable," where a "bona fide and reasonable charge" means "a charge for service actually performed."

56. Plaintiff and the class were injured and lost money or property as a result of Defendants' unfair practices because they had cars repossessed based on invalidly assessed premiums, accounts sent to collections and credit histories tarnished based on invalidly assessed premiums, and lost money to premium or interest payments on invalidly placed policies.

## Second Cause of Action
*Violation of Cal. Finance Lender's Law*
(On Behalf of Plaintiff Conklin and the Class, against Wells Fargo)

57. Plaintiff incorporates by reference all allegations, as if fully set forth herein.

58. Wells Fargo's imposition of force placed insurance on Plaintiff and the class was unlawful under the California Finance Lenders Law, Cal. Fin. Code § 22311, which provides, "No person in connection with or incidental to the making of any [consumer loan] may require the borrower to contract for purchase, or agree to purchase, any other thing in connection with the loan."

59. Wells Fargo is a person within the meaning of the Finance Lenders Law, § 22008.

60. In connection with making auto loans, Wells Fargo required borrowers to agree to pay for the acquisition of force placed insurance.

61. Force placed insurance is a "thing" within the meaning of § 22311.

62. Force placed auto insurance that names Wells Fargo as the beneficiary[36] is not exempted from the Finance Lenders Law's prohibition against a lender requiring a collateral purchase of insurance. Wells Fargo's force placed insurance policies covered only Wells Fargo's interest in the collateral, not the borrower's interest in the collateral.

---

[36] *See* § 22313(d).

13
CLASS ACTION COMPLAINT

63. Wells Fargo willfully contracted for and assessed fees for collateral insurance that were not permitted by the Finance Lenders Law.[37]

64. Plaintiff and the class seek an order declaring, pursuant to § 22750: that their loan contracts with Wells Fargo are void; that Wells Fargo has no right to collect on the principal of the loan (including on the collateral that secures the principal); and that Wells Fargo has no right to collect on any interest, premiums, or other charges associated with the loan.

**Third Cause of Action**
*Unlawful Conduct under UCL*
(On Behalf of Plaintiff Conklin and the Class, against Wells Fargo)

65. Plaintiff incorporates by reference all allegations, as if fully set forth herein.

66. By assessing charges for force placed insurance, and repossessing vehicles based on charges for force placed insurance, when such charges were unlawful under Cal. Fin. Code § 22311, Wells Fargo engaged in an unlawful business practice within the meaning of the UCL, Cal. Bus. & Prof. Code § 17200 et seq.

67. Plaintiff and the class were injured and lost money or property as a result of Wells Fargo's unlawful practices because they had cars repossessed based on unlawfully assessed premiums, accounts sent to collections and credit histories tarnished based on unlawfully assessed premiums, or paid unlawfully assessed premiums or interest on such premiums.

**Fourth Cause of Action**
*Conversion*
(On Behalf of Plaintiff Conklin and Class, against all Defendants)

68. Plaintiff incorporates by reference all allegations, as if fully set forth herein.

69. Plaintiff and the Class owned, possessed, and had a right to possess their cars and the money in their bank accounts.

70. Defendants intentionally and substantially interfered with Plaintiff's and the Class's property by having their cars repossessed and/or taking possession of premium payments and interest from their bank accounts through an automatic deduction.

71. Plaintiff and the Class did not consent to repossession or automatic payment based on charges for duplicative force placed insurance.

---

[37] *See* § 22750(a).

72. Plaintiff and the Class were harmed by losing access to their vehicles and/or money.

73. The amount of money automatically removed for payments and interest is quantifiable using information in Wells Fargo's possession or control. The value of access to a vehicle is quantifiable based on the fair rental value of that vehicle during the time period that Plaintiff and the Class were dispossessed of the vehicle.

74. Defendants' repossession of vehicles based on illegitimate premium charges was oppressive and despicable conduct that subjected Plaintiff and the Class to cruel and unjust hardships, including loss of the vehicle, stigma associated with repossession, and significant harm to Plaintiff's and the Class's credit reports. Defendants had the vehicles repossessed in conscious disregard of Plaintiff and the Class's right to possess the vehicle, as Plaintiff and the Class had their own coverage, which Defendants were aware of or should have known of.

75. Defendants' conduct was malicious, fraudulent, and oppressive. As a result, in additional to actual damages, Plaintiff and the Class seek exemplary/punitive damages.

### Fifth Cause of Action
*Violation of RICO*
(On Behalf of Plaintiff Conklin and Class, against all Defendants)

76. Plaintiff incorporates by reference all allegations, as if fully set forth herein.

77. Defendants are persons, within the meaning of RICO, because they hold a legal or beneficial interest in property (*e.g.*, collateral on loans).

78. Defendants violated RICO, 8 U.S.C. § 1962, by conducting or participating in the affairs of an enterprise that derived income from a pattern of racketeering activity, or by conspiring to do the same.

79. Wells Fargo and National General were members of an associated-in-fact enterprise, within the meaning of RICO (18 U.S.C. §§ 1961 (4) and 1962 (c)), because they had a common purpose of profiting, through unlawful means, from force placing insurance; there was a relationship between Wells Fargo and National General, including a contractual arrangement to provide kickbacks for force placing insurance; and the duration of the enterprise spans years, providing sufficient time to pursue the enterprise's goals. While pursuing the common purpose

within the RICO enterprise, Wells Fargo and National General are distinct entities with independent corporate structures.

80. The enterprise engaged in interstate commerce by transacting across state lines. The enterprise additionally affected interstate commerce by engaging in activity that had an effect on national markets for insurance and vehicle financing.

81. Defendants participated in the operation of the enterprise by knowingly implementing the enterprise's agenda. In fact, without Wells Fargo's and National General's participation, the enterprise could not achieve its goal of profiting, through unlawful means, from force placing insurance on Wells Fargo customers.

82. Defendants knowingly participated in a scheme to obtain money or property through use of false or fraudulent pretenses. The scheme sought to obtain premium payments, interest on premiums, and repossessions of vehicles through use of force placed insurance. For the scheme to work, car buyers needed to finance their vehicles through Wells Fargo, rather than another bank, such as one that did not use force placed insurance. To entice or avoid scaring away customers, Wells Fargo fostered the false impression in its loan agreements that customers who already had insurance would never be charged for force placed insurance; and if force placed insurance were required, that Wells Fargo would purchase it on the open market in an arm's length transaction. The truth was that Wells Fargo performed none of its own checks to verify that a customer lacked insurance before force placing a policy on their vehicle. Also, Wells Fargo was self-dealing, not entering an arm's length transaction. After entering an exclusive arrangement with National General, Wells Fargo would receive a master policy that covered all vehicles in one of Wells Fargo's portfolios. When force placing insurance, Wells Fargo would issue a certificate of coverage under the master policy showing that the vehicle was insured. Wells Fargo did not negotiate at arm's length with an insurer for an individual policy because Wells Fargo was issuing these policies itself under its master policy. National General facilitated the scheme by having its insurance agents approve the certificates of coverage, and generate commissions on them, which was then paid back to Wells Fargo. To give the enterprise cover, National General was supposed to check whether the Wells Fargo customers already had insurance, but made no legitimate effort

to do so. National General was also supposed to notify customers prior to force placing insurance, but made no legitimate effort to ensure notification.

83. The above representations were material because they were capable of influencing a person to part with money or property, by inducing the person to sign up for a car loan with Wells Fargo, despite the inclusion of the force placed insurance provision. The other large lenders did not have such a provision.

84. Defendants intended to deceive customers about the nature and character of how and when a forced insurance policy would be placed.

85. In furtherance of the enterprise's agenda, Wells Fargo engaged in two or more predicate acts of mail and/or wire fraud within a 10-year timeframe.

86. Wells Fargo used the mail and/or interstate wire communications to send loan agreements to dealerships. In addition, National General used the mail to send letters, on Wells Fargo letterhead, to Wells Fargo customers to communicate with them about the premiums they owed for force placed insurance. Wells Fargo also had interstate wire communications with National General concerning the scheme, and coordinating of the kickbacks. And Defendants facilitated interstate money transfers using wire communications, when customers paid force paced insurance premiums or interest on premiums. These mail and wire communications were all essential parts of the scheme and constitute numerous acts of mail and wire fraud.

87. There is a pattern of two or more predicate acts because the acts were related and continuous. All mail and wire fraud were related to the same scheme to profit, through unlawful means, from force placing insurance. The acts occurred continuously throughout the course of Wells Fargo's program for force placed insurance, which began in 2006 and ended in September 2016.[38]

88. Defendants' behavior poses a threat of continued racketeering activity. Racketeering has become Defendants regular way of doing business. Wells Fargo has maintained its astounding profit levels for a conventional bank by fostering a culture that rewards

---

[38] Laura J. Keller and Noah Buhayar, *New Wells Fargo Scandal Seen as Proof Controls Still Lacking*, Bloomberg (July 27, 2017), https://www.bloomberg.com/news/articles/2017-07-28/wells-fargo-to-compensate-customers-for-unwanted-auto-insurance.

racketeering, in an attempt to squeeze blood from a nickel. As recent revelations reveal, fraud is rampant: account opening fraud; fraud in force placed mortgage insurance; fraud in force placed auto insurance. These practices stop only when exposed publicly. And National General depends on force placed insurance for its very livelihood, and will continue to do whatever it takes to keep big bank business.

89. Plaintiff and the class are "persons," within the meaning of RICO, and have been injured in their business or property by: paying premiums plus interest on force placed insurance which Wells Fargo was not legally entitled to place; having their cars repossessed if they didn't pay; and otherwise experiencing interference with their property rights in their cars, including the right to enjoyment and use of the vehicle.

90. Plaintiff's and the Class's injuries and financial damages were proximately caused by the conduct constituting the RICO violation.

91. Plaintiff and the class seek three times actual damages, injunctive relief, costs, and attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

### Prayer for Relief

WHEREFORE, Plaintiff Gene Conklin, on behalf of himself and the Class, seek the following relief:

A. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing Gibbs Law Group LLP as Class Counsel, and finding that Plaintiff is a proper representative of the Class;

B. Declaratory relief, declaring Wells Fargo's actions unlawful, and the applicable loan agreements void and unenforceable;

C. Injunctive relief, including an order prohibiting Defendants from engaging in the wrongful acts described above, and requiring Wells Fargo to remediate negative impacts to credit reports caused by its wrongful acts;

D. Plaintiff also requests damages, treble damages (where appropriate), punitive damages (where appropriate), restitution, disgorgement, attorneys' fees, statutory costs, and such other and further relief as is just and proper.

**Demand for Jury Trial**

Plaintiff demands a trial by jury for all issues so triable.

Dated: August 25, 2017

Respectfully submitted,

GIBBS LAW GROUP LLP

By:    */s/ Eric H. Gibbs*

Eric H. Gibbs (SBN 178658)
Michael L. Schrag (SBN 185832)
Aaron Blumenthal (SBN 310605)
505 14th Street, Suite 1110
Oakland, CA  94612
Telephone:  510-350-9700
Facsimile:  510-350-9701
ehg@classlawgroup.com
mls@classlawgroup.com
ab@classlawgroup.com

*Attorneys for Plaintiff*